**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* ) | |
| LIZETTE MUNOZ and WESLEY FRENDT, ) | |
| ) | |
| Plaintiffs-Relators, ) | |
| ) | |
| v. ) | Case No. 11-cv-7899 |
| ) | |
| COMPUTER SYSTEMS INSTITUTE, INC., ) | Judge Robert M. Dow, Jr. |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs-Relators bring this action against their former employer, Computer Systems Institute, Inc. ("CSI"), pursuant to the False Claims Act, alleging that CSI knowingly caused false claims to be filed by making a number of misrepresentations to the Department of Education, its accrediting agencies, and students that wrongfully enabled CSI to secure student financial aid in the form of loans and grants from the federal government. This matter is before the Court on Defendant's motion to dismiss Plaintiffs-Relators' amended complaint [33]. For the reasons set forth below, the Court grants in part and denies in part CSI's motion to dismiss [33]. As set forth below, Plaintiffs-Relators allege only a single count (Count I: FCA, 31 U.S.C. § 3729 et seq.), and that count remains pending; however, not all of the theories advanced by Plaintiffs-Relators' are viable based on the allegations in the amended complaint.

**I.      Background**[1]

   **A.      General Background**

The federal government distributes funds under Title IV of the Higher Education Act ("HEA"), 20 U.S.C. § 1094, in order to assist with the costs of secondary education.

---
[1] For purposes of Defendant's motion to dismiss, the Court assumes as true all well-pleaded allegations set forth in the complaint. See, *e.g., Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

1

Notwithstanding Congress's admirable intentions, the large sums of money administered under Title IV have led to abuses. See, *e.g., Leveski v. ITT Educational Servs. Inc.*, 719 F.3d 818, 820 (7th Cir. 2013). Specifically, Congress became concerned in 1992 that "recruiters [of students for institutions of higher education] paid by the head are tempted to sign up poorly qualified students who will derive little benefit * * * and may be unable or unwilling to repay federal guaranteed loans." *United States ex rel. Main v. Oakland City Univ.,* 426 F.3d 914, 916 (7th Cir. 2005). Thus, in order to receive federal funds under the HEA, schools must enter into a Program Participation Agreement with the Department of Education, in which they agree to abide by a host of statutory, regulatory, and contractual requirements. 34 C.F.R. § 668.14(a) (2010). The schools must continually certify their compliance with the current DOE regulations through program participation agreements ("PPAs") in order to receive federal financial assistance award money. 20 U.S.C. § 1094(a).

Among these requirements is a recruiter-incentive compensation ban, which prohibits institutions from paying recruiters "incentive payments" based on the number of students that they enroll. More specifically, this ban prohibits schools from "provid[ing] any commission, bonus, or other incentive payment based directly or indirectly on success in securing enrollments or financial aid to any persons or entities engaged in any student recruiting or admission activities or in making decisions regarding the award of student financial assistance." 20 U.S.C. § 1094(a)(20). In 2002, the DOE amended its prior regulations to create a "safe harbor" provision interpreting and clarifying this ban on recruiter-incentive compensation. As amended, the regulation provided that an educational institution may, without violating the ban on incentive compensation, provide "payment of fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or

2

awarded financial aid." 34 C.F.R. § 668.14(b)(22)(ii)(A) (2010) ("Safe Harbor Provision"). In July 2011, the DOE eliminated the Safe Harbor Provision for salary-based compensation. See 75 Fed. Reg. 66832 (Oct. 29, 2010). In commenting on the elimination of the Safe Harbor Provision, the DOE noted that "the Department's experience has demonstrated that unscrupulous actors routinely rely upon these safe harbors to circumvent the intent of [the incentive compensation ban] of the HEA." *Id.* at 66872. According to the DOE, "the safe harbors have served to obstruct [the objectives of the incentive compensation ban] and have hampered the Department's ability to efficiently and effectively administer the title IV, HEA programs." *Id.* Current DOE regulations flatly prohibit institutions receiving federal award money from adjusting the salaries of student recruiters and financial aid officers "based in any part, directly or indirectly, upon success in securing enrollments or the award of financial aid." 34 C.F.R. § 668.14(b)(22)(ii)(A) (2013). In other words, educational institutions must comply with the ban on incentive compensation in order to be eligible for federal grant money, but may no longer rely on the Safe Harbor Provision to shield compensation programs based directly or indirectly upon recruitment numbers.

### B. Factual Background

CSI is a provider of post-secondary education founded in 1989 and headquartered in Skokie, Illinois. CSI, which claims to have over 10,000 graduates, offers three "career programs" and is approved by the DOE to provide Title IV funding to eligible students. Many of CSI's students depend on Title IV loans to pay for the programs. CSI has expanded rapidly over the past several years and now owns and operates five campuses in Illinois and two in Massachusetts.

Plaintiffs-Relators are former CSI employees. Lizette Munoz worked for CSI as an admissions representative from December 2010 to May 2011. Wesley Frendt worked as an admissions representative from July 2009 to June 2011. Plaintiffs-Relators filed this qui tam action under the False Claims Act ("FCA") against CSI in November 2011. The case was filed

under seal pursuant to 31 U.S.C. § 3730(b)(2). The seal requirements are designed to provide the United States with an opportunity to investigate the allegations before a defendant has knowledge of the action. The government then has the option of intervening and assuming control of the litigation. In this instance, the United States declined to intervene, and Plaintiffs-Relators chose to pursue the matter on their own. CSI then moved to dismiss and Plaintiffs-Relators amended their complaint. CSI followed by filing a second motion to dismiss.

According to the allegations in the amended complaint, CSI's three career programs—"Healthcare," "Networking," and "Business"—each cover eight months of study but confer no degree or transferable credits. Every student who qualifies for federal financial aid is accepted. CSI charges between $14,835 and $15,500 for its programs, which allegedly matches the amount of loans and grants that its students can receive under Title IV. According to the amended complaint, CSI's receipt of Title IV funds has grown from $161,000 in 2006-07 to approximately $18 million in 2011-2012.

Plaintiffs-Relators allege that when CSI entered into each PPA with the DOE, it was not in compliance with, and did not intend to comply with, the statutory and regulatory requirements upon which Title IV eligibility and payment are conditioned. Specifically, Plaintiffs-Relators allege that CSI failed to comply with the following provisions identified in the PPA: 20 U.S.C. § 1094(a)(8) (relating to institutions that advertise placement rates); § 1094(a)(21) (stating that an institution will meet the requirements of nationally recognized accrediting agencies); and § 1094(a)(20) (relating to incentive compensation). Plaintiffs-Relators also allege that CSI failed to comply with the following provisions not identified in the PPA: 20 U.S.C. § 1088(b)(2)(A)(ii) (dealing with a 70% placement rate rule) and 34 C.F.R. § 668.72 (relating to misrepresentations to students). Finally, Plaintiffs-Relators allege that CSI knowingly violated these rules at the time that it signed PPAs and audit statements.

## II. Legal Standard

A Rule 12(b)(6) motion to dismiss tests the sufficiency of the complaint, not the merits of the case. *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990). In reviewing a motion to dismiss under Rule 12(b)(6), the Court takes as true all factual allegations in Plaintiff's complaint and draws all reasonable inferences in its favor. *Killingsworth*, 507 F.3d at 618. To survive a Rule 12(b)(6) motion to dismiss, the claim first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed. R. Civ. P. 8(a)(2)), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Second, the factual allegations in the claim must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations in the complaint are true. *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). However, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the * * * claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555) (ellipsis in original). The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chi.*, 631 F.3d 823, 832 (7th Cir. 2011); *cf. Scott v. City of Chi.*, 195 F.3d 950, 952 (7th Cir. 1999) ("Whether a complaint provides notice, however, is determined by looking at the complaint as a whole.").

Where a complaint sounds in fraud, the allegations of fraud must satisfy the heightened pleading requirements of Rule 9(b). Fed. R. Civ. P. 9(b); see also *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007) (citing *Rombach v. Chang,* 355 F.3d 164, 170–71

5

(2d Cir. 2004)). The False Claims Act "is an anti-fraud statute and claims under it are subject to the heightened pleading requirements of Rule 9(b) * * *." See *U.S. ex rel. Gross v. Aids Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005); see also *U.S. ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 376 (7th Cir. 2003). Rule 9(b) states that for "all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). A complaint satisfies Rule 9(b) when it alleges "the who, what, when, where, and how: the first paragraph of a newspaper story." *Borsellino,* 477 F.3d at 507 (quoting *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir. 1990)). Rule 9(b), read in conjunction with Rule 8, requires that the plaintiff plead "the time, place and contents" of the purported fraud. *Fujisawa Pharm. Co., Ltd. v. Kapoor,* 814 F. Supp. 720 (N.D. Ill. 1993). "The purpose of this heightened pleading requirement is to 'force the plaintiff to do more than the usual investigation before filing his complaint.'" *Amakua Dev. LLC v. H. Ty Warner,* 411 F. Supp. 2d 941, 953 (N.D. Ill. 2006) (citations and internal quotation marks omitted).

**III.  Analysis**

To combat fraud, the False Claims Act imposes civil liability on a party who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" paid by the government. 31 U.S.C. § 3729(a)(1)(A) & (B). From a practical standpoint, it would be impossible for the government alone to unmask and prosecute all potential FCA violations. Accordingly, the statute provides a *qui tam* enforcement mechanism, which allows a private party (*i.e.*, a relator) to bring a lawsuit on behalf of the government and against an entity to recover money the government paid as a result of fraudulent claims. See 31 U.S.C. § 3730(b). Plaintiffs-Relators allege a cause of action based on subsections (A) and (B) of § 3729(a)(1).

Over the years, numerous FCA claims have been brought in the context of higher education. Due to Eleventh Amendment sovereign immunity, state colleges and universities are immune from *qui tam* liability under the FCA. See *Vermont Agency of Natural Resources v. United States ex rel. Stevens,* 529 U.S. 765, 787–88 (2000) (FCA "does not subject a State (or state agency) to liability in such actions."). Private educational institutions—such as CSI—do not enjoy this immunity. FCA lawsuits involving a for-profit institution frequently allege that the institution has defrauded the government by signing a PPA containing falsities. In FCA parlance, this is known as a "false certification theory," which provides that a claim "can be false where a party merely falsely certifies compliance with a statute or regulation as a condition to government payment." *United States ex rel. Hendow v. Univ. of Phoenix,* 461 F.3d 1166, 1171 (9th Cir. 2006). The overarching concern is that educational entities—motivated by profit rather than rankings or other industry benchmarks—have every incentive to maximize enrollment by recruiting unqualified students who will not be able to repay their loans, and the financial consequences of these defaults will trickle down to the detriment of the federal government and its taxpayers. See, *e.g.*, *United States ex rel. Main v. Oakland City Univ.,* 426 F.3d 914, 916 (7th Cir. 2005); *United States ex rel. Lopez v. Strayer Educ., Inc.,* 698 F. Supp. 2d 633, 635 (E.D. Va. 2010).

Under subsection (A) of § 3729(a)(1), Plaintiffs-Relators must prove that (1) there was a false or fraudulent claim; (2) Defendant knew the claim was false; and (3) Defendants presented the claim or caused it to be presented to the United States for payment or approval. *United States ex rel. Fowler v. Caremark RX, LLC,* 496 F.3d 730, 740–41 (7th Cir. 2007). Under subsection (B), Plaintiffs-Relators must prove that (1) Defendant made, or caused someone to make, a statement to receive money from the government; (2) the statement was false; and (3) Defendant knew it was false. See *Fowler,* 496 F.3d at 741. If the claim under section (B) is premised upon a false certification of regulatory compliance, the relator also must prove that the certification was a

7

condition of or prerequisite to payment by the government. *United States ex rel. Crews v. NCS Healthcare of Ill., Inc.,* 460 F.3d 853, 858 (7th Cir. 2006); *United States ex rel. Gross v. AIDS Research Alliance–Chicago,* 415 F.3d 601, 604 (7th Cir. 2005); see also *U.S. ex rel. Kennedy v. Aventis Pharmaceuticals, Inc.*, 610 F. Supp. 2d 938, 941 (N.D. Ill. 2009). In other words, "[a] false-certification theory only applies where the underlying regulation is a 'condition of payment,' meaning that the government would not have paid the claim had it known the provider was not in compliance." *United States ex rel. Hobbs v. MedQuest Assocs., Inc.,* 711 F.3d 707, 714 (6th Cir. 2013); see also *United States ex rel. Hoffman v. National College*, 2013 WL 3421931, at *9 (N.D. Ind. July 8, 2013).

Plaintiffs-Relators premise the single count of their amended complaint on several theories, which the Court will address below. However, the Court first briefly addresses CSI's argument that Plaintiffs-Relators have not pled any facts in support of the allegation that CSI "knowingly" submitted false claims. Under Rule 9(b), it is sufficient to plead knowledge generally. 31 U.S.C. §§ 3729(a)(1)(A–B) require that an individual act "knowingly" in presenting, causing to be presented a false claim, or making, using or causing to be used a false record or statement. Specifically, the FCA requires actual knowledge of the information and either an act in deliberate ignorance or in reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b)(1)(A)(i-iii). Plaintiffs-Relators have sufficiently alleged that Defendant acted "knowingly" and also have given multiple examples throughout the amended complaint that indicate an intent to deceive. See also *U.S. ex rel. Capriola v. Brightstar Educ. Group, Inc.*, 2013 WL 1499319, at *6-7 (E.D. Cal. April 11, 2013). These allegations meet Rule 9(b)'s requirement. See, *e.g., DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990); *United States ex rel. Chandler v. Cook County, Ill.*, 277 F.3d 969, 976 (7th Cir. 2002) (noting that Congress "changed the knowledge element of the offense, making success more likely" by setting "a fairly low

8

standard"). Having concluded that Plaintiffs-Relators have sufficiently alleged scienter, the Court now turns to the various theories asserted by Plaintiffs-Relators and challenged by CSI.

### A. Incentive Compensation Ban

Plaintiffs-Relators allege that CSI reviewed the salaries of its admissions representatives every six months, all of the salary increases were based exclusively on success in securing enrollments, and CSI disguised the scheme with a point system in which all non-sales elements were a sham. Defendant counters that Plaintiffs-Relators merely allege that terminations, demotions, and eligibility for pay raises were based on the number of students an employee enrolled, but not salary increases.

Plaintiffs-Relators allege ample facts to support their contention that CSI's multi-factor "Admissions Salary Review," used to evaluate recruiters' compensation, was in fact a sham and that CSI's system of review depended exclusively on success in recruiting. See, *e.g.*, ¶¶ 76-77, 79, 80, 81 n.2, 82-83, 85-90. Numerous courts have held that allegations of a sham multi-factor compensation system that in actuality depends exclusively on recruitment success state a valid FCA claim. In *U.S. ex rel. Lee v. Corinthian College*, for example, the Ninth Circuit held that the inclusion of allegedly non-recruitment performance rating "does not allow us to conclusively determine whether [defendant's] method of awarding salary increases falls within the Safe Harbor Provision." 655 F.3d 984, 993-94 (9th Cir. 2011). The *Lee* court noted that even if one or more of the non-recruitment-related categories contributed to admissions representatives' compensation, they would not automatically demonstrate a legitimate compensation policy sufficient to automatically defeat an FCA claim if the categories dealt with "basic performance requirements expected of any employee." *Id.* at 994; see also *U.S. v Education Management Corp.*, 871 F. Supp. 2d 433, 449-51 (E.D. Pa. 2012) (even though written compensation policy met the incentive

compensation rule, the complaint stated a violation of the rule "as implemented"); *U.S. ex rel. Hoggett v. University of Phoenix*, 2012 WL 2681817, at \*6 (E.D. Cal. 2012) (rejecting argument that the inclusion of qualitative criteria on a performance evaluation "demonstrates conclusively [that defendants] did not violate the [PPA]"); *U.S. ex rel. Irwin v. Significant Education*, 2009 WL 322875, at \*2 (D. Ariz. 2012) (existence of purportedly non-recruitment performance review factors did not defeat claims). Defendants correctly point out that CSI's salary review policy as written does not appear to violate the Incentive Compensation Ban; however, as described above, Plaintiffs-Relators have sufficiently alleged that the policy as implemented may violate the FCA.

### B. Advertising Job Placement Rates

Under 20 U.S.C. § 1094(a)(8), CSI's PPA with the DOE had to provide that, if CSI advertised job placement rates as a means of attracting students to enroll in the institution, CSI would make available to prospective students, at or before the time of application, the most recent available date concerning employment statistics, graduation statistics, and any other information necessary to substantiate the truthfulness of the advertisements. Plaintiffs-Relators allege that CSI undertook to provide potential students with employment placement information of prior students based on patently false placement statistics in violation of the PPA signed by CSI. In doing so, Plaintiffs-Relators contend that CSI failed to provide the most recent available data concerning employment statistics, graduation statistics, and any other information necessary to substantiate the truthfulness of the advertisements, in violation of the 20 U.S.C. § 1094(a)(8).

Plaintiffs-Relators also allege that CSI recruited students through a high-pressure script conducted by admissions representatives that misrepresented placement rates. In one document provided to prospective students, entitled Acknowledgment of Placement Statistics, CSI told them that CSI graduates had placement rates ranging from 70% to 74% depending on the date of the document and the particular program. CSI posted similar claims on its website. Additionally,

Plaintiffs-Relators allege that they were instructed to confirm the accuracy of placement numbers given to prospective students even though CSI management told them that the numbers were false or inaccurate. Plaintiffs-Relators also allege in detail that these statistics were substantially inflated and that CSI knew it.

CSI contends that Plaintiffs-Relators fail to allege any "advertisements" and thus § 1094(a)(8) is not in play. At this stage of the case, the Court accepts Plaintiffs-Relators' examples as constituting "advertisements" because these statements and documents clearly were a "means of attracting students to enroll in the institution," as referenced in § 1094(a)(8). See also *U.S. ex rel. Gatsiopoulous v. Kaplan Career Institute, ICM Campus*, 2011 WL 3489443, at *5 n.7 (S.D. Fla. Aug. 9, 2011). Furthermore, Plaintiffs-Relators' allegations satisfy the statutory language that such statistics be "made available" to students. Viewing the allegations in the light most favorable to Plaintiffs-Relators, they have alleged that CSI knowingly disseminated false statistics regarding gainful, future employment in order to attract students, all while they were supposed to be making accurate representations to students regarding their chances at future employment. At this stage, these allegations state a claim.

    **C.**    **The "70% Rule"**

The amended complaint contains allegations that CSI violated the "70% rule" of 20 U.S.C. § 1088(b)(2)(A)(ii). Under that provisions, a program of at least 300 but less than 600 clock hours of instruction, offered during a minimum of 10 weeks, should have a "verified placement rate of at least 70%." As Plaintiffs-Relators concede, CSI correctly points out that Plaintiffs-Relators have failed to allege that CSI's programs fit into the range of 300 to 600 clock hours. Thus, Plaintiffs-Relators will not be allowed to proceed with their FCA claims on the theory that CSI violated the "70% rule."

11

### D. Misrepresentations about the Nature of CSI's Educational Programs

Plaintiffs-Relators contend that CSI routinely made false, erroneous or misleading statements concerning the particular types, specific sources, nature and extent of its "institutional, programmatic, or specialized accreditation"; whether a student "may transfer course credits earned at the institution to any other institution"; and whether successful completion of a course of instruction qualifies a student "to receive, to apply to take or to take the examination required to receive, a local, State, or Federal license, or a nongovernmental certification required as a precondition for employment," or to "meet additional conditions that the institution knows or reasonably should know are generally needed to secure employment in a recognized occupation for which the program is represented to prepare students," in violation of 34 C.F.R. § 668.72. Relators allege in detail that CSI instructed admissions representatives about the Healthcare and Network Career Programs. They also allege that admissions representatives, at CSI's direction, falsely informed students that they could use CSI credits toward a college degree from other institutions despite the fact that CSI knew its credits would not be accepted. Finally, they allege that CSI's course catalogue and admissions representatives falsely told prospective students that CSI offered associate and bachelor's degree programs, even though it offered none, and that completing the non-degree "career program" would give students a head start on the credits necessary to receive a degree from CSI.

CSI contends that to form the basis of a claim under the FCA, the regulatory provision that is violated must be specifically named in the PPA, even though the PPA contains a general agreement to abide by all regulatory provisions promulgated under statutory authority. At this stage, the Court disagrees. Rather, the "condition of payment" standard appears to be met through the language of the PPA, which expressly conditions federal student assistance funding upon initial and continued compliance with the applicable regulations. See, *e.g.*, *United States ex rel. Sobek v.*

12

*Education Management*, LLC, 2013 WL 2404082, at *3, *10 (W.D. Pa. May 31, 2013). Plaintiffs-Relators still must prove scienter and materiality; in other words, they must show that the false statement was material to the government's decision to pay and that CSI knowingly or recklessly ignored that it was violating the regulation in question. But here, Plaintiffs-Relators allege that CSI was lying to prospective students—and using a CSI-created script to do so—about key issues related to a prospective students' decision to go to school. These allegations suffice to state a claim under this theory.

### E. Accreditor Requirements

Plaintiffs-Relators allege that CSI failed to comply with 20 U.S.C. § 1094(a)(21), which states that an institution will meet the requirements of nationally recognized accrediting agencies. However, in their complaint, Plaintiffs-Relators do not identify any false statement made to CSI's alleged accreditor, North Central Association Commission on Accreditation and School Improvement ("NCACASI"). Although Plaintiffs-Relators discuss e-mail correspondence about CSI "meet[ing]" standards of the Accrediting Council for Independent Colleges and Schools ("ACICS"), Plaintiffs-Relators' amended complaint alleges that NCACASI accredits CSI. Additionally, although the amended complaint contains vague allegations about "falsely reported data for accreditation purposes," it does not satisfy the basic requirements of Rule 9(b): Plaintiffs-Relators do not allege any facts indicating that there were certain requirements imposed by NCACASI or that CSI failed to meet those requirements, nor do they identify any false statements made by CSI about meeting those requirements. The most that Plaintiffs-Relators allege is that CSI indicated on certain forms that certain figures were reported to NCACASI; they do not allege what NCACASI's requirements were and whether CSI met those requirements. As a result, Plaintiffs-Relators will not be allowed to proceed with their FCA claims on the theory that CSI

violated 20 U.S.C. § 1094(a)(21). If, during the course of discovery, Plaintiffs-Relators identify additional agencies that accredited CSI and identify false information submitted to an agency, Plaintiffs-Relators may seek leave to amend. But for now, their allegations fail to state a claim under this theory.

**IV.    Conclusion**

For the reasons set forth above, the Court grants in part and denies in part CSI's motion to dismiss [33]. As previously set forth, Plaintiffs-Relators allege only a single count, and that count remains pending; however, not all of Plaintiffs-Relators' theories are viable.

Dated: October 25, 2013            _____

Robert M. Dow, Jr.

United States District Judge